# IN THE UNITED STATES DISTRICT COURT FOR THE FILED
## MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

2025 FEB -3 AM 8: 55

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

**HARRIET C. CALLIER, *Pro Se,***
740 Revels Drive
Nashville, Tennessee 37207
ncbam.mn@gmail.com
Phn: 205-205-1105 | 989-766-7000

      Plaintiff

v.

**STATE OF TENNESSEE, TENNESSEE
HIGHER EDUCATION COMMISSION,
TENNESSEE BOARD OF REGENTS,
TSU BOARD OF TRUSTEES, and
TENNESSEE STATE UNIVERSITY**
*each in their official capacities.*

      Defendants

Case No. **3:25-cv-0121**

Honorable _____

**ORAL ARGUMENT IS REQUESTED**

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Plaintiffs Harriet C. Callier ( "Plaintiff"), *Pro Se*, brings this civil action based upon personal

knowledge and records against Defendants State of Tennessee, Tennessee Higher Education

Commission; Tennessee Board of Regents; TSU Board of Trustees; and Tennessee State

University (collectively "Defendants," and each a "Defendant") in their official capacities

      1) To enjoin all parties from proceeding with the sale or (otherwise transfer of ownership

and/or use) of State of Tennessee properties under use and ownership of Tennessee State

University including both Avon Williams Campus buildings, and adjacent properties;

2) To discontinue any efforts currently aimed at the privatization of the educational delivery components –in part or in whole– of Tennessee State University; and

3) To enjoin the State of Tennessee to more fully desegregate its state-supported higher education systems through intentional efforts to establish parity among all of its universities – namely parity between its traditionally White institutions (TWIs) previously established by State de jure segregation and the systems' single Minority-serving Institution (MSI) as codified under The Higher Education Act of 1965 (HEA) (Pub. L. 89–329) as a Historically Black College and University (HBCU) – namely Tennessee State University (TSU).

## SUMMARY OF THE CASE

### INTRODUCTION

1.      Immediately following the passage, intentional efforts were not implemented to fully dismantle the State's de jure segregation; failure to respond adequately was in direct violation of rights afforded to the Plaintiff by *Brown v. Board of Education*, 347 U.S. 483 (1954), and Title VI of the Civil Rights Act of 1964.

2.      Additional lawsuits were necessary – resulting in cases addressing Tennessee's responses to enforce the equitable application of the Equal Protection Clause of the Fourteenth Amendment, *United States v. Fordice*, 505 U.S. 717 (1992), Geier Consent Decree (2001) and other applicable federal and state laws.

   i.  In 2001, Tennessee entered into an Agreement –specifically the Geier Consent Decree (2001) – designed to dismiss a 38-year long legal complaint that Tennessee was deficient in key areas for parity of the four-year schools, including unnecessary program duplication at the TWIs, encroachment of services, campus climate and environment, recruitment and admissions, retention and graduation, diversity of faculty and staff and

advisory boards, and enhancement of its HBCU.

a. While the distinction of HBCU is codified in federal legislation, a more relevant identification of colleges and universities that serve racially-marginalized and 'differently prepared' populations is that of NASA-MSI – or simply MSI (minority serving institutions).

    1. In Tennessee, the distinction of MSI is self-identified by the respective institution where enrollment decisions can ensure that percentages remain within predetermined ranges;

    2. The distinction of MSI represents the percentage of minority students by comparison to its 'non-minority' students;

    3. While national data reporting of the Integrated Postsecondary Education Data System (IPEDS) reporting for Tennessee State University (003200) shows that matriculation of White students was the fastest growing population between 2001 and 2020, to date, TSU remains the only MSI in the state-supported system of schools; TSU Black student enrollment alone remains greater than 77% of the total student population –further establishing its distinction as a NASA-MSI.

    4. Plaintiff brings this action to enjoin the State of Tennessee and later, the TSU Board of Trustees upon its confirmation, from proceeding with the sale or (otherwise transfer of ownership and/or use) of State of Tennessee properties under Tennessee State University, alleging fraud, waste, and abuse where various schemes over a ten-year period of overcharging contrary to policy and data manipulation were put in place to undermine the decision-making process as they are the foundation of a violation of the Equal Protection

Clause of the Fourteenth Amendment to the United States Constitution, as interpreted in *Brown v. Board of Education*, 347 U.S. 483 (1954), and any other applicable federal and state law.

b. Plaintiff alleges that a sale (or otherwise transfer of ownership or use) under these conditions will **yield irreparable harm to the Plaintiff's rights and protections under the Equal Protection Clause of the Fourteenth Amendment,** United States v. Fordice, 505 U.S. 717 (1992), **Brown v Board 347 U.S. 483 (1954),** and any other applicable federal and state law**.**

c. The sale of the buildings and properties undermines access to equitable state-supported education; it disproportionately undermines the state-approved funding formula; and disproportionately impacts Plaintiff's rights and interests – even violating principles of desegregation and equality as established in *Brown v. Board of Education*, 347 U.S. 483 (1954) , Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment, *United States v. Fordice*, 505 U.S. 717 (1992), the precedence of Geier Consent Decree (2001) as an agreed blueprint within the State of Tennessee higher education system, and any other applicable federal and state law.

3. TSU serves as a vital educational institution for the Plaintiff as a resident of the State – with its interwoven exchange to taxpayers and to its residents by contributing to the economic, social, and cultural advancement of the State of Tennessee and to that of the nation.

4. Defendants' actions to effect a rush sale, transfer, rental, or otherwise repurpose of TSU's property, without adequate legal authority or due process, undermine TSU's ability to serve the Plaintiff and the public interest.

5.    Defendants' actions to put in place a rush sale, transfer, rental, or otherwise repurpose of TSU's property – absent of adequate legal authority or due process– violates federal Fifth Amendment protection of right to due process and state laws designed to support and to protect public institutions of higher education equitably.

6.    Further, Plaintiff brings this matter before the Court to request a declaratory review of the 10-year window following development and implementation of the Tennessee FOCUS Act (2016) as its legislation has shown to reestablish and nurtured de jure segregation of the States higher education systems – specifically as it violates the separate but equal doctrine of Brown v. Board (1954), later United States v. Fordice (1992), and specific to Tennessee's Geier Consent Decree (2001).

7.    Plaintiff brings this action to enjoin the State of Tennessee and later, the TSU Board of Trustees upon its confirmation by the State of Tennessee General Assembly, from proceeding with privatization of the education components  –in whole or in part– by the State of Tennessee of the higher education system unit entitled Tennessee State University, alleging fraud, waste, and abuse in the decision-making process as they are the foundation of a violation of the Equal Protection Clause and Due Process Clauses of the Fourteenth and Fifth Amendments to the United States Constitution, respectively.

   a.  The action does not intend to amend or terminate any articulation agreements currently in place with TSU and private education suppliers whose coursework supplement TSU degree programs of study.

   b.  While the Geier Consent Decree (2001) contained key directives to be completed within five years of the Agreement, the collective of the Agreement, in whole,  serves as an collaborative blueprint among the parties to the original lawsuits to establish a more fully integrated state supported higher education system.

c. Remaining motions of the 38-year old legal Geier actions were Dismissed upon agreement of all parties;

d. While ongoing efforts would be necessary to maintain and further the intended work to more fully shed its systems of the vestiges of prior de jure segregation, by 2007 the State of Tennessee had completed its responsibilities of the Decree both within the allotted time frame and to the satisfaction of the Court; an Order to that end is on record.

e. By 2012, early discussions with the Tennessee General Assembly would materialize in legislation being introduced in the 2015 General Assembly to put into place the FOCUS Act (2016) where FOCUS is the acronym for "Focus on College and University Success" legislation.

f. **All things being equal,** the FOCUS Act (2016) intended to yield parity to the respective universities as noted in the Final Drafts before ratification;.

g. Various components of the restructuring were questioned repeatedly – including the disproportionate structure of the funding format under the new FOCUS Act (2016) structure.

    1. With no reference to intent, FOCUS Act (2016) returned the state-supported universities to de jure segregation through its funding formula and lack of meaningful oversight at the single MSI where tuition and fees for state residents was already offered with a 20% discount to that of other institutions in the remaining six universities;

        1. The likelihood that less fortunate students will apply to (and only receive acceptance from) the least expensive University is great;

        2. The state-supported TWIs do not participate in the common application processes where many of the minority students apply because of the

efficiency of the application fee process.

2. FOCUS Act (2016) would reinforce de jure segregation through funding formula at the single MSI where annual tuition and fees increases are capped at 5.5 % –by THEC maximum increase mandates– for state residents attending the six universities;

   3. Each University is capped at its starting point in 2016;

   4. TSU enrollment for 2016 was just under 8,000 students whereas a 15% increase of 1,200 students in subsequent years should be within a reasonable range;

      a. The false, inflammatory and damaging reporting of a $50 million deficit is intentionally misleading;

      b. The false, inflammatory and damaging reporting released to the general public at the 2024 Board of Trustee meetings –specifically as delivered by the consultant– demonstrated that the 1,200 student increase single-handedly created a $50 million deficit for TSU–even after accounting for the academic year's tuition actually received.

      c. The reporting further stressed that the state school took in too many students who were financially unprepared for college – even with PELL and other federal financial aid options.

      d. The reporting references the large number of students who attended and were eligible for various discounts (discounts resulting from state law such as children of state employees; work-related discounts; etc);

      e. The reporting also leaves the public believing that the scholarship options were largely "full-payment, 4-year" options where this is

intentionally misleading.

i.    A small number of students were awarded merit based four-year scholarships for the COVID funds in the following year;

ii.    However, the COVID funds were extended in 90% of the scholarships as 'last-dollar awards' only where 'last-dollar' is defined as the actual award amount is extended after all PELL and other federal, state, and private awards are applied.

    1.    In academic year 2021-2022, Plaintiff's responsibilities required first hand knowledge of each scholarship prior to releasing eligible refund amounts to the respective student;

    2.    In academic year 2022-2023, Plaintiff's responsibilities, as detailed to the Enrollment Management Division, provided her with first-hand knowledge of the individual award letters as students and families called for clarification of their respective awards.

    3.    Leading into each academic year, student accounts were awarded funds to address outstanding balances that occurred during the year where the amount would prevent the student from returning. Priority here was determined by the respective schools and programs in concert with the TSU Foundation and the TSU FInancial Aid Office.

    4.    The individuals providing the consultants with the modified version as shared to the public are the same 2-3 individuals who were first accused by the State as withholding

information in annual external audit reviews and now
compiling reports to show runaway deficits in selective years.

h.   Most discussions regarding the funding format for the state-supported universities
     brush past the fact that instruction and administration must be covered in the
     per-student tuition and fees that are assessed and paid on the front end of each year's
     training process.

     1.   **All things were never equal** from the start of the FOCUS Act (2016) with an
          8,000 student enrollment at TSU compared to 20,000 student enrollment at
          University of Memphis (UofM) and others in the state-supported system.

          f.   For example, 2024-2025 Tuition and Fees at TSU is assessed at $4,308.00
               per 12 undergraduate credit hours for Tennessee residents; Tuition and fees
               for UofM is $5,364.00 per 12 undergraduate credit hours for Tennessee
               residents. Fall 2024 Enrollment: UoM was 13,643 and TSU was 4,472
               where the comparative revenue for the two schools is $73 million (UofM)
               and $19 million (TSU).

          g.   Even at 8,000 enrollment, the receivables for the same UofM term would
               not exceed $35 million.

          h.   If the dire extremes of the TSU Board of Trustee information of 9,000
               students at TSU in 2022-2023 are accepted on face value, then FOCUS Act
               legislation has created a marked segregation between the ability to fulfill the
               education mission at the MSI versus that of the TWI universities where the
               MSI can never grow attendance to comparable numbers of the other system
               counterparts..

          i.   The funding formula regarding graduation rates is directly impacted by the

number of students allowed to enroll at the school – again capped by the FOCUS Act for perpetuity.

j.  To the degree that state resident completion rates are affected by starting point GPAs and national test scores such as ACT or SAT specifically as it relates to the Tennessee HOPE, other merit-based scholarships, TSU then must compete with not six but 55 other public and private Tennessee colleges and university duplication of programs –where the additional schools are provided Tennessee taxpayer-funded HOPE scholarship benefits;

k.  Additionally, TSU must compete, to some degree, with a TBR-run eCampus at the University level for Regents Online Degree Program (RODP) courses and awarding of degrees where program duplication is not readily interchangeable – specifically with costs and other factors. compiling reports to show runaway deficits in selective years.

i.  In its 114th Session, the Tennessee General Assembly is set to interview and confirm a team of exceptionally prepared individuals to serve as the TSU Board of Trustees.

1)  Spring 2025 is the first scheduled confirmation of this body following the State Legislature's vote in Spring 2024 to unseat the previous TSU Board of Trustees in its entirety;

2)  Individually, the named TSU Trustees have impeccable talents that would lend well to any governing body of any University in Tennessee's higher education system;

3)  Given the ten-year experience since initial discussions of the FOCUS Act (2016), it is highly unlikely that the collective of these individuals would be

identified to serve together as a single governing body for any other school in Tennessee's higher education system except at a Black University as each of the voting members identify as African American.

a)  TSU has a vast number of accomplished alumni of varying races and ethnicities to select from when identifying a Board of Trustees in compliance with the FOCUS Act (2016);

b)  TSU has no shortage of community-based individual who are keenly interested in the success of the University who are not alumni;

c)  Considering the decision to appoint and to confirm the collective of named individuals as the TSU Board of Trustees in only the most positive attempt to support the current mission and work of the institution, the decision is also likely the single most glaring identification that under no uncertainty does the Governor and the Tennessee General Assembly understand Tennessee State University in 2024 to be anything other than a Black University.

   i)  The Tennessee General Assembly has the Office of Legal Services at its disposal to review its work for both intent and applicability where the Office's stated mission is "To provide to the members of the General Assembly legal analysis and advice; as well as research, drafting, library, and codification services; all in a professional, confidential, and non-partisan manner."

   ii)  In similar fashion, the Tennessee Governor's Office has staff to review the final versions of work to ensure that it meets with the Governor's beliefs and intent.

d) Where the Tennessee General Assembly and/or Governor's Office believes and acknowledges a Black University in its system of higher education, it is in direct violation to Plaintiff's rights and protections under Brown v Board (1954).

## JURISDICTION AND VENUE

7.    Pursuant to 28 U.S.C. § 1331, 1343 (a)(3) and 1367(a), Plaintiff seeks declaratory and injunctive relief for deprivations under color of state law of federal civil rights under, Brown v Board 347 U.S. 483 (1954); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Equal Protection Clause of the Fourteenth Amendment.

8.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in this District, and the Defendant Parties operate principal business activity within this District.

i) This action is supported by the following statement of facts by the Plaintiff and is not being presented for any improper purpose, such as

1. To harass or to cause unnecessary delay or needless increase in the cost to either party;

2. To circumvent possible employee-related matters of any individuals –including the Plaintiff– that would be more appropriately addressed in other venues. The discussion herein is limited to presenting business-related matters that violate Plaintiff's protections as an alumni, financial supporter and private citizen; and to prevent further adverse actions against the

Tennessee higher education system – including those specifically aimed at Tennessee State University as a Unit of that system.

## PARTIES

8.      Plaintiff (CALLIER): Harriet C. Callier is a resident of Tennessee, a registered voter, a taxpayer, and has taken degree-seeking classes within multiple components of the Tennessee higher education system–including degree-seeking work atTennessee State University.  As of late, the Plaintiff's continued attendance (and that of similarly-situated residents) has been discussed in the most condescending and inflammatory nature as it is likely to include tuition discounts in place through state legislation.  She brings this action to ensure her rights as a citizen and resident are protected in the furtherance of the  educational mission of the state-supported higher education system.  Further, given her relationship since 2016, Plaintiff is likely one of only five individuals with first-hand knowledge and records to address the misrepresented deficits and timelines identified as the sole reason for the sale or otherwise disposal of University property.

9.      Defendant The State of Tennessee (STATE): The STATE, through its legislation, representatives and agencies, has taken specific actions that forfeit its right to immunity protection.  These actions are in violation of the U.S. Constitution and federal laws governing higher education that threatens the property and operations of TSU – where these actions violate the Plaintiff's Rights under Brown v. Board of Education, 347 U.S. 483 (1954) and other U.S. laws.

10.      Defendant Tennessee State University (TSU): TSU, through its representative Board (and specifically in its operations since March 2024 absent confirmation by

the Tennessee General Assembly), has taken actions to threaten the property and operations of TSU where these actions violate the Plaintiff's rights under Brown v. Board of Education, 347 U.S. 483 (1954) and other U.S. laws.

    A)   Defendant TSU Board of Trustees: TSU Board of Trustees, upon 2025 confirmation by the Tennessee General Assembly, has publicly discussed taking actions to threaten the property and operations of TSU as the confirmed body has the authority to sell (or otherwise dispose of) TSU property.

11.     Defendant Tennessee Higher Education Commission (THEC); THEC, through its official capacity as an agent of the Tennessee General Assembly chiefly responsible for administration of components of and its relevant responsibilities for the furtherance of an unsegregated system of public education – specifically that of higher education. For purposes of this action, T.C.A § 49-7-201 (2023) through T.C.A. § 49-7-203 (2023) address the high level responsibilities of THEC for both actions and inactions that give rise to the violation of the Plaintiff's rights under Brown v. Board of Education, 347 U.S. 483 (1954) and other U.S. laws.

    A)   Under the FOCUS Act (2016), the Legislation names THEC as assuming responsibility related to regulations and other issues affecting institutions of higher education in the state of Tennessee.

12.     Defendant Tennessee Board of Regents (TBR); TBR, through its official capacity as an agent of the Tennessee State Legislature chiefly responsible for administration of components of and its relevant responsibilities for the furtherance of an unsegregated system of public education – specifically that of higher education – is responsible for both actions and inactions that give rise to the violate the Plaintiff's rights under Brown v. Board of Education, 347 U.S. 483 (1954) and other U.S. laws.

## LEGAL STANDARDS AND ARGUMENT

### A. Likelihood of Successful Rule on the Merits

13.     To date, individuals identifying as representatives of TSU and STATE Legislature have provided public conversations regarding the operational decisions and financial statuses of TSU.  A common thread throughout the messages is that the University has had a substantial deficit from the past two operating years –namely 2022-2023 and 2023-2024– where the  deficit is between $50 Million and $60 Million.

a) The reported deficit calculation is used as the sole basis for the sale, transfer, repurpose, etc. of specific TSU properties – largely referring to only a couple of academic years beginning 2022-2023.

b) Financial calculations and timeframes dating back to 2012  have been heavily manipulated and misreported to prejudice the listening audience of Tennessee residents and State higher education system students and alumni.

i)  Plaintiff has personal knowledge and hard-copy evidence that will demonstrate to the satisfaction of the Court a student account deficit that is both manipulated and implied to build since 2012

ii)  Plaintiff has personal knowledge, witnesses, and hard-copy evidence –copies of which were generated in real time– dating back to academic year 2012 where the $50 million reporting for a single 2022-2023 academic year does not include another $34 million that had been amassed since 2010;

1) Plaintiff was employed from March 2016 as a manager where a 2016 employment contract and job posting identify such;

2) Plaintiff assumed additional student financial services assignments beginning November 2020 as an Interim Director pursuant to a TSU Extra Service Agreement;

3) Former Assistant Bursar assumed the full-time vacated manager role upon beginning November 1 as identified in TSU Promotion Agreement provided to Sammy Zaki available where the reporting structure shifted away from the Bursar to the AVP for Business and Finance. Simultaneously, Zaki assumed a second FTE position as Budget Director;

4) Beginning June 2022 through February 2024, Plaintiff was then detailed to the Enrollment Services Division and provided a limited number of ad hoc student financial services system update tasks at varying intervals as documented in email threads granting system access.

c) Plaintiff reported the variances– internally and/or to the Tennessee Comptroller's Office– throughout her employment where most reports were investigated by University President Glover;

   i) From Plaintiff's personal knowledge and Board of Trustee records, it can be demonstrated that the President's investigations were thwarted by the same principal actors – leading to further misinformation being the basis of future administrative decisions.

ii)   The manipulated investigations and data allowed additional sums of student account balances to be amassed year after year where the data would be used to undermine the integrity and stability of the University.

14.   Given the manipulated nature in which key records were prepared and presented to identify a grossly inflated $50 Million deficit and the deliberate engagement of principal actors, the Plaintiff moves that with a detailed review of the merits as more thoroughly exhausted in the action for injunctive relief and subsequent reportings will demonstrate that the financial crisis purported by employees on behalf of the Defendant Tennessee State University is not supported by either generally-accepted financial principles, state policy or process of evidence.

a)   The Plaintiff alleges that records and practices demonstrate that the student-related fiscal deficit includes $9 million in Saudi-student balances.

i)   This number is grossly manipulated and overstated for the sole purpose of undermining the University, its students and the residents of the State of Tennessee;

ii)   The AVP for Business and Finance refused multiple verbal and written requests for staff and equipment to address the manual invoicing of third-party vendors – including the invoicing of this account;

iii)   With the exception of Spring 2022 and subsequent Terms, the amounts owed to TSU by the Saudi government have been paid – roughly $1 million in total.

1)   In 2015 and 2016, staff transferred and/or retired to adjust an unconscious volume of work assigned to the student financial services staff; with $24 million in uncollected student accounts no collection staff were ever hired.

2) In the retirements, Plaintiff, alone, was assigned the responsibilities of three FTE positions with no realistic expectation that the work could be accomplished where verbal and written requests for more accomplishable workloads for her team were met with additional work being assigned.

iv) Nearly $7 million of this line item is not the responsibility of the Saudi government's education arm – namely the Saudi Arabian Cultural Mission (SACM);

1) U.S. universities agree, in advance of term registration, the portion of attendance that is or will become the student's responsibility and that the Saudi government will not pay;

2) Prior to Fall 2016, Saudi students were never notified of outstanding balances prior to graduation; the discussion was two fold in that the balance would add to the amount of uncollected student account receivables under then University President Glovers, and the outstanding balance would likely prevent the Saudi individual from obtaining VISA approval to return to the United States at any future date outside of that of a continuing F-1 student status.

3) Through the Fall 2021 Term, SACM was invoiced where SACM paid TSU its portion of fees due and owing; TSU AVP for Business and Finance prevented all attempts to collect the outstanding portion that were due from the students;

   (a) Given familiarity with manual invoicing processes for this account, Plaintiff (and not the Manager) billed through Fall 2021 for this SACM account prior to being detailed to another Division.

4) The 2021 Manager placed no SACM accounts for either collection and later bad debt write off whereas the same employee as Assistant Bursar placed for collections only negligible numbers of SACM accounts between 2015 to 2020.

5) Again in 2020, TSU AVP for Business and Finance refused all efforts to establish process, staff and needed tools to collect the now outstanding $34 million in student account balances (TSU Collection Office Proposal provided as Exhibit R).

    (a) To date, no serious hiring or reallocation of FTE to address collection in any amount. From the Proposal, a Collection Manager was hired (and other positions were published but not filled) for a purely manual process; the software was not implemented.

    (b) TSU AVP for Business and Finance blocked support from state-contracted collection account manager willing to provide man hours to move the stagnant accounts to the collection agencies per State Policy;

    (c) Inquiries by the Chief of Staff and President's Office were met with misrepresentations – including when the TSU Internal Audit Office completed the inquiry (Email following Findings Report is available);

    (d) The outstanding balances were intentionally compiled and allowed to blossom to demonstrate mismanagement by then University President Glover and to demonstrate absolute dire need of the University as presented to the public in 2025.

b) Furthermore, any actions taken under false pretenses, including property sales, transfer or repurpose, would be unlawful and harmful to TSU where this harm

would be an irreparable injury to the Plaintiff's rights and protections under Brown v Board (1954) and those of Title VI of the Civil Rights Act of 1964.

c) The amounts of student financial services amassed –ranging from $50 million to $90 million depending on the presenter– is significantly less than the $554 million as reported by the State of Tennessee as an amount that is due and owing to TSU under the Morrill Act (1890).

   1) In 2022, the Tennessee Legislature approved $250 million of the amount that it determined as due and owing to be paid to TSU;

      i) Should TSU become a privatized entity before full allocation and payment of the back payments identified, it is not a certainty that the University will remain entitled to or will received the funds that are earmarked for a state land grant institution;

      ii) As of January 2025, the current TSU Interim President reported that roughly $80 million has been used for deferred maintenance to TSU properties where the remaining portion is available for use –with reclassification approval by the Tennessee General Assembly; and an additional $32 million previously identified for a new Agriculture Department building has been released for use.

**B. Irreparable Harm**

15. The sale or otherwise transfer of TSU property under fraudulent and misleading circumstances would cause permanent damage to the university's ability to fulfill its

educational mission. Once completed, such transactions cannot be undone as noted in City of Sherrill v. Oneida Indian Nation of New York (2005). Here, the author, Justice Ruth Bader Ginsburg opines: "When … had relinquished governmental reins over an area long before, it could not regain them through open-market purchases from current titleholders."

## C. Public Interest

16.     Preserving the integrity of public systems of higher education – like the role that TSU serves within that system – serves the public interest, particularly in light of its combined role in addressing segregation of systems and other educational inequities of the past. Upholding this mission aligns with the principles established in Brown v. Board of Education, 347 U.S. 483 (1954), other U.S. laws, and the state-specific blueprint of the Geier Consent Decree (2001).

17.     This action is submitted to preserve the properties for current and future university use and mission. In support of this motion, Plaintiff states as follows:

## FACTUAL ALLEGATIONS

17.     At present, Tennessee State University is a public, land-grant university established under the Morrill Act of 1890, serving as a vital institution of higher education agriculture, and military (veteran) science.  Prior to legislation of Brown v. Board of Education, 347 U.S. 483 (1954) and later, Title VI of the Civil Rights Act of 1964, TSU was the only state-supported school for students of color; in similar fashion it was the largest employer of people of color in the STATE of Tennessee's higher education system..

a) At present, a significant percentage of the University's enrollment continues to be individuals of all color and ethnicity from historically underserved communities where African Americans are 78% of the student population as the only state-supported NASA-MSI in Tennessee.

b) Prior to the Geier Lawsuit and Consent Decree (2001), the State of Tennessee had historically created a structure that leads to underfunding compared to other institutions in its higher education system, perpetuating systemic inequities. The 38-year old case was settled, in part, by the Geier Consent Decree Agreement (2001) to address all Tennessee-supported schools with specific efforts aimed at equity.

13. Since 2001, TSU's property and resources have continued to be underfunded, as highlighted in reports on inequitable funding for TSU and HBCUs as a whole. The rush sale, transfer, rental, or otherwise repurpose TSU property would further entrench systemic inequalities, violating public policy goals established under the Morrill Act and reaffirmed in Adams v. Richardson, 480 F.2d 1159 (D.C. Cir. 1973).

14. The Plaintiff alleges that records, witness statements and practices can demonstrate that the student-related fiscal deficit is intentionally misrepresented in areas beyond those that are listed below:

a) The $50 Million in uncollected student account revenue is grossly manipulated and overstated for the sole purpose of undermining the University, its students and the residents of the State of Tennessee

b) Where the actual receivable due to the University by TBR Policy is between $10 Million and $12 Million. The University has made only negligible attempts to collect the receivables.

c)  Collection activity was aborted in 2015 – the year prior to Plaintiff's employment–
    where only negligible numbers of accounts were actually identified and released by
    the Assistant Bursar for free placement with state-contracted collection agencies; no
    other Bursar Office employee had access to generate the specific reports needed to
    compile the placement data elements.

d)  One state-contracted collection agency had an ad hoc arrangement with the
    University to 'accept placement or warehouse' a significant number of nursing school
    loans where no effort would be made to collect the balances due.  The borrowers were
    never contacted during this placement; had the contacts been made, the balances of
    the nursing federal loans were eligible for loan forgiveness.  The agent received
    corporate credit from her employer for securing the large batch of accounts; TSU
    appeared compliant with the warehousing and continued to amass the balances as
    uncollected revenue.

15.     The Plaintiff alleges further, from personal experience, the following
individuals were complicit in conspiring to augment policy, practices, and financial record
keeping.  At intervals since 2014 and applicable to their respective official relationships with
TSU, these actions directly and negatively impacted the financial integrity of the TSU through
augmented reports–both provided to and withheld from– senior TSU administrators, contracted
consultancy firms, the TSU Board of Trustees, and state auditors in annual reviews:

a.  Robert (Bob) Hughes:  Plaintiff has familiarity with Hughes only through her responses
    to student account receivables office details as Hughes left the TSU employment prior to
    the Plaintiff being hired.  Plaintiff identifies that in 2016, she inherited an unprocessed
    student account deficit that exceeded $22 million – the larger portion had been left by
    Hughes upon his retirement.

  i. Upon Hughes' retirement, Bradley White assumed direct control of this portion of the outstanding fiscal responsibility.

  ii. Hughes would later attempt to return to TSU on two attempts between 2019 to 2021 as CFO.

b. Bradley White: White failed to adequately supervise and control the fiscal responsibilities with which he had been charged – resulting in what the body of individuals currently serving as TSU Board of Trustees specifically identifies as in excess of $50 Million deficit on the current University accounting records. From 2016 to present, White continues to provide (or withhold based on personal preference) questionable transparency of information needed in critical financial decision making.

  i. White remains an active member of the team to rescue the University from its 'fiscal challenges" that he, personally, was instrumental in orchestrating or amassing.

    1. One phase of the rescue process in action is the vacating of the Charlotte Avenue plant facility for a sale (or otherwise disposal) with the doctored records as the principle reason for said sale and the need for immediate intervention of the Courts.

  ii. By 2019, system reports utilizing Ellucian BANNER Reports Management for the student financial records showed outstanding student account receivables as $34 million.

  iii. Between 2018 and 2023, White had no attempts at successful submissions of bad debt write offs while outstanding student debt amassed to greater than $42 million.

iv.  As identified in the TSU Board of Trustee Packet for June 2024, TSU AVP Business and Finance would submit a bad debt writeoff for $5.4 million in 2023 that was compiled contrary to State Policy and in violation of Federal law regarding bad debt dismissal of federal funds.

1.  In the financial reports that identify a $50 million deficit for the two most recent academic years, there is no mention of the additional $34 million already being compiled stealthy since 2014.

v.  As noted in the TSU Board of Trustee Packet for June 2024, TSU AVP Business and Finance, TSU Foundation dollars were not deposited 'timely' but stopped short of explaining that all bank deposits are made only by AVP White's staff and on a time schedule as approved by him since the 2020 COVID on-campus activity modifications.

vi.  Following a February 2017 retirement, select responsibilities were not reassigned to remaining staff for month-end processes that were critical to monthly bank reconciliations.

1.  The retiree took painstaking efforts to transfer all job-related knowledge; AVP White reassigned the position dollars but not all of the position functions and without disclosing that he had full knowledge of the impact of related units.

2.  By 2021, another consulting firm representative included the information in written corrective steps designed to better align the Ellucian BANNER ERP; AVP White would continue to ignore that funds from two different bank accounts were being deposited into a single account.

3. It is Plaintiff's experience that the Bursar-related recommendations for system corrections were totally ignored and never implemented at AVP White's discretion and direction.

c. Sammy Zaki: Zaki failed to adequately supervise and control the fiscal responsibilities which he had been charged–under both his position as Supervisor and later as Manager. His intentional and deliberate refusal resulted in what the body of individuals currently serving as TSU Board of Trustees now identifies as a $50 Million deficit on the current TSU accounting records.

   i. In August 2024, Zaki returned during the proposed hiring freeze as an active member of the team to rescue TSU from its 'fiscal challenges" that he, personally, had been instrumental in orchestrating and amassing. One phase of the rescue process in action is the vacating of the Charlotte Avenue plant facility for a sale (or otherwise disposal) using the doctored outstanding student financial account records as the principle reason for said sale.

      1. Two Write-off attempts in 2018 would be called into question (and later withdrawn) for failing to comply with federal, state and TSU Policy guidelines for the various types of funds.

      2. Even with several requests (including a documented TSU Human Resources Complaint) Zaki (through to White's approval) refused to secure–even on a temporary basis– staff and tools to address any significant outstanding collections.

      3. In 2020, White would later silence complaints or objections by returning the collection processes to Zaki under title Manager; Plaintiff understood from

discussion and hardcopy communication that the Manager role would be detailed away from the Bursar's Office to report to White directly.

ii. Plaintiff acknowledges that financial questions regarding mismanagement and other information were reported through the proper channels both within the University and to the Tennessee Comptroller's Office.

iii. Plaintiff has firsthand knowledge of receivable reconciliation being completed as a daily assignment in the TSU Bursar's Office with full balance by month-end.

1. Both the Head Account/Cashier and staff, and the Financial Analyst for the receivables reconciliation reported to Zaki.

2. The Financial Analyst transferred away from the Bursar's Office January 2020 where no effort was made to fill the vacancy:

   a. Zaki, with White's permission, left all monthly reconciliation work unprocessed from February 2020 through October 2020.

   b. This unfinished work directly implicated the monthly bank reconciliation as this was all work and account postings of all student account and departmental funds being received by the university and deposited into a single account at the bank.

   c. In January 2021, an outside accountant was hired through a placement agency to complete the unaddressed receivables reconciliation work.

d. Johnnie C. Smith: Smith assumed a key role in undermining the enrollment and fiscal records of the initial implementation of the University's Global Campus. In its inaugural APPLE Cohort, Smith conspired with Bursar Office staff and White to generate convoluted records that undermined the University's efforts and work, as well as, student participation in the initial series of course enrollment and financial recordkeeping.

    i.    From personal knowledge, the Plaintiff observed that the more damaging actions were limited to a single academic year; the impact on the better than 800 enrolled students was both damaging and lasting as it served to undermine the program integrity and the support of affected students and alumni alike. The single academic year of records manipulation amassed financial errors of tuition that should never have been recorded where the total for two semesters exceeded $300 thousand. When discovered by Bursar Office staff, AVP White refused to permit Plaintiff and her team members to make or facilitate the needed corrections.

    ii.    Believing that Dual Enrollment fee assessment (also a responsibility of Dr. Smith) were illegal, AVP White and Dr. Smith requested that Banner Fee Assessment access be extended to Plaintiff on two additional occasions to update the Ellucian BANNER Fee Assessment Module for said population; AVP White had authority instead to address and correct processes that he believed to be inappropriate.

e.    Amy Wood Boles: Over a multiple years, Wood Boles refused to adequately supervise and control the fiscal responsibilities with which she had been charged by intentionally returning in excess of $30 Million in federal aid to the federal government that legally paid out to student accounts – resulting in what the Board now identifies as a $50 Million deficit on the current University accounting records. Wood Boles would also identify the roster of student accounts and specific dollar amounts per student in response to the internal policy for distribution of three sets of COVID-related disbursements to students. Wood Boles is not currently employed by the University.

f.    Dwayne Tucker: Tucker, while not an employee of TSU, was chiefly responsible for the TSU Foundation's 501(c)3 Executive Board at an interval during the past ten years. In April 2024, Tucker assumed a role with the body of individuals currently serving as TSU

Board of Trustees. By December 2024, Tucker would assume the role of Interim University President for TSU.

i. As Foundation Board leadership, Tucker acknowledges that he developed and shared (2016 - 2018) an augmented synopsis of TSU administrative projections to challenge the work of the immediate past presidents (Shields, and then Glover) in administrative directions and projections for the University. Tucker would then collaborate with White to ensure that the student account record keeping and overall financial picture remained questionable and unprocessed through normal collection and bad debt efforts.

   1. The Proposal serves well for a stand-alone privatized college or university.

   2. Tucker's 2016 Proposal stops short of holding State actors responsible for furthering *Geier* as a blueprint and *Brown* or *Fordice* as law in reestablishing the system free of de jure segregation legislation.

   3. From 2016 to present, both Tucker and White continue to provide (or withhold based on personal preference) questionable transparency of information needed in critical financial decision making.

   4. Tucker continues to acknowledge in multiple meetings since December 17, 2024 that he used his travel dollars from 2016 to 2018 as TSU Foundation Board Chair to visit the various TSU Alumni Chapters across the country. The Plaintiff's experience from these visits was discussions with the various Unit leaders after Tucker had met or visited with seed of division regarding his vote of no confidence for the then University President and Cabinet. The hardcopy reports that were shared were prepared and released by Zaki and White – largely in violation of FERPA

because they included student-specific information that was not available to the general public. Upon knowledge, the then CFO gave instructions that stopped the unlawful release of student information; to no avail. Zaki and White continued to release student records to Tucker above and beyond what would be normal in blanket business or scholarship-related reports as a Foundation Chair.

5. By 2018, Tucker would collaborate with VP White to select key Foundation Donor accounts that were then removed from previously-approved Bad Debt Write-offs to return to active collection status.

   a. The accounts were of individuals who had made significant financial contributions or significant fundraising work under then University President Glover;

   b. While each of the targeted donors had a day-to-day relationship with both the University and with the Foundation, neither individual was contacted directly regarding the balances of roughly $1,000.00 or less where one of the affected individuals.

   c. Active collection work had not occurred for the targeted accounts in as many as 40 years on one account; the accounts were given to collection agencies where at least one donor was contacted using only their professional setting and not their home address resulting in unnecessary embarrassment and initial discouragement from future work as a TSU Foundation supporter.

<ol type="a" start="4">
<li value="4">

d. The greater intent was not to collect the funds owed from donors whose combined efforts to the Foundation exceeded $2 million but to embarrass the donors and to build ill-will and mistrust towards TSU and the University staff.

e. It is Plaintiff's experience that these types of personal attacks implying outstanding debt, missing money, or otherwise financial investigations are alluded to often since 2016 as a means of embarrassment and to build ill-will and mistrust towards the University and/or University staff. While each incident appears isolated, they are a pattern of attacks to undermine support of the University.
</li>
</ol>

g. Tim Warren: Warren at various times after 2016 was either employed by TSU or contracted to TSU for computer system services; Warren was chiefly responsible for proprietary computer services including student financial services, and the TSU Foundation. Warren was released with the September 2024 layoffs but later returned as a contractor per Tucker. Tucker notes the need for the contracted return as Warren has "so woven himself into the personal fabric" of the Ellucian BANNER ERP system that TSU cannot function without him. Warren was instrumental in the inappropriate accesses used in the Microsoft TEAMS software. Equally important for the financial misreporting, Warren committed (in 2018) to providing access to the Collections Module for Ellucian BANNER; AVP White refused the rollout of this software needed to effectively collect a $34 million outstanding balance.

h. Select Contractors

i.     White worked with the representative from at least one state-approved contractor to amass uncollected debt of federal student loans – namely the nursing loans.

ii.     Amassing said loans in this manner further added to the funds that were not available for use at the University where the financial damage served to dismantle trust and confidence as intentional attacks on the reputation of both the University and the student borrower.

iii.     Both records and witnesses are readily available.

16.     TSU as an employer both knew and had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm – including financial harm. Further, TSU administrators had expertise to know that the risk of harm would likely materialize –whether real or fraudulently generated – and cause the damages that are now being used in this rush to relinquish governance and ownership of key plant assets. DiCosala v. Kay, 91 N.J. 159, 173 (1982).

a.     In DiCosala v. Kay, 91 N.J. 159, 173 (1982) the primary question raised "is whether an employer owes a duty of reasonable care in the hiring and retention of employees whose aggressive or reckless characteristics or lack of competence –whether intentional or otherwise– in the performance of their employment duties may endanger such third persons (here, the employer as a whole).

i.     The Plaintiff clarifies fraud as willful, malicious intent; the intent of specific Defendants and key employees at all times was to undermine the integrity of the TSU reporting where intervening parties would later be viewed as the heaven-sent rescuers.

ii.     The defendants and employees in preceding paragraphs –while participating for various self-serving reasons– conspired for the greater part of 8 - 10 years to bring

the current financial picture and privatization actions to fruition. For most of the NashvilleNext window of the past 12 years, Dr. Glenda Baskin Glover was the chief employee responsible for oversight of the University. The evidence demonstrates that the actions, however, were aimed at a specific dismantling of the TSU Unit for purposes including an augmented participation in The NashvilleNext and other public-private initiatives with no regard for a specific person as chief or trustee representation. While the focus has been on the prior President and prior TSU Board of Trustees, this redirection of attention have proven to be an intentional distraction from the equally relevant harmful concerns in process.

17.     The attempted rush sale, transfer, rental, or otherwise repurpose of TSU property –the only state-supported MSI– disproportionately affects underserved communities and would exacerbate existing educational inequities, contravening the public's interest in equal access to education as recognized in Brown v. Board of Education, 347 U.S. 483 (1954), and subsequent cases – including *Fordice* and the Geier Lawsuit and Consent Decree (2001).

    a. The State of Tennessee has failed to ensure that the properties are maintained in adequate condition for use by the residents of Tennessee for educational purposes and education-related use whereas the implementation of the FOCUS Act (2016) did not absolve the State of its responsibility to the higher education system and to its residents.

    b. Whereas the Plaintiff service on an ad hoc committee for a business entity that would have been directly impacted had purchase of additional properties been completed, the State of Tennessee reneged on its 2014-2015 commitment to expand the TSU main campus footprint through the purchase of parcels

bordered by Hadley Park, Ed Temple Blvd, and John A Merritt Blvd, and John A Merritt Blvd (zip code 37209).

c. The sale or otherwise transfer of property from educational purposes – in part or in whole– will negatively impact the available per student tuition and fees and full-time equivalent/completion funding formula for TSU.

18. Since 2001, TSU's property and resources have continued to be underfunded, as highlighted in federal letters to specific institutions including TSU. The rush sale, transfer, rental, or otherwise repurpose TSU property would further entrench systemic inequalities, violating public policy goals established under the Morrill Act and reaffirmed in Adams v. Richardson, 480 F.2d 1159 (D.C. Cir. 1973).

19. The rush sale, transfer, rental, or otherwise repurpose TSU property would irreparably harm the university's ability to fulfill its mission, jeopardize its accreditation – both programmatic and as a university, and undermine its financial stability. In January 2025, a Board of Trustees consultant reaffirmed the understanding that the FOCUS Act carveout and establishment of 'independent university schools' away from the umbrella protections of a true state-supported system, is a significant factor in the MSI institution now entertaining financial exigency.

A. Public properties should never be sold in private sales, –where the undisclosed amounts are considered to be the benefit of the general public. Generally, public properties are not transferable or sold to individuals or private entities beyond that of surplus property; even in a public Auction, private sales of public properties (that are not surplus properties or tax delinquencies) further undermine public trust.

B. Sale of property and other assets in a public, formal bankruptcy can and would occur if reorganization is really needed. **Bankruptcy would allow for proper valuation**

**of the reported debt; allow for a proper valuation of school and system assets; and allow for transfer/disposal of public assets upon full disclosure of any financials in question.**

C. Given the independent attributes of universities as defined in the FOCUS Act (2016), Tennessee State University is indeed eligible, uniquely and perfectly situated for reorganization protections under United States Bankruptcy Code.

1. Chapter 9, Title 11, United States Code is a chapter of the United States Bankruptcy Code, available exclusively to municipalities and assisting them in the restructuring of their debt.

2. The term 'municipality' denotes "a political subdivision or public agency or instrumentality of a State," but does not include a state itself. States, themselves, are therefore unable to file for bankruptcy even though they have defaulted in their obligations.

   a. Copperhill (Polk County), Tennessee in 1988, Richmond Unified School District in 1991, and Valley Health Systems (Hospital) District, California in 2007 are examples of previously completed political subdivisions or public agency bankruptcy filings.

3. To prevent overlap with Chapter 11, § 101(41) of the U.S. Bankruptcy Code (11 U.S.C. § 101(41)) defines the term "person" to exclude many "governmental units" as defined in § 101(27), and "municipality" as defined in § 101(40). Although the legislative history of the Bankruptcy Code suggests that bankruptcy courts should interpret the definition of "governmental unit" broadly, the bankruptcy court determined that the definition should not be interpreted so broadly as to encompass an entity not actually carrying out some governmental function.

   a. A bankruptcy eligibility ruling by Judge Jacqueline P. Cox of the U.S. Bankruptcy Court for the Northern District of Illinois examined this issue.

      i. In re Lombard Public Facilities Corp. (2003), Judge Cox found, in a fact-specific analysis, that an Illinois public

entity is eligible to restructure its debts under protections and public transparency of the Bankruptcy Code.

b. The bankruptcy court's decision hinged on the interpretation and application of the definition of "governmental unit."

    i. In re Las Vegas Monorail Co., 429 B.R. 770, 788 (Bankr. D. Nev. 2010), the bankruptcy court's focus was on three key questions to determine that the debtor was not a "governmental unit," and was an eligible debtor under Chapter 11 of the Bankruptcy Code —

        1. whether the entity in question has traditional governmental attributes, or engages in traditional governmental functions;

        2. the extent of state control over the entities attributes and functions; and finally

        3. the state categorization of the entity is not dispositive.

## CAUSES OF ACTION

**COUNT I: VIOLATION OF DUE PROCESS (Fourteenth Amendment)**

**COUNT II: VIOLATION OF DUE PROCESS (Fifth Amendment)**

**COUNT III: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**COUNT IV: VIOLATION OF EQUAL PROTECTION (Brown v. Board of Education, 347 U.S. 483)**

20. Plaintiff realleges and incorporates by reference all preceding paragraphs – including items where intentional fraud, waste and abuse was reported through the proper channels both within the University and to the Tennessee Comptroller's Office.

21.     Public educational institutions such as TSU serve a critical public purpose, and any deprivation of their property or operational integrity without due process violates the constitutional protections outlined in Mathews v. Eldridge, 424 U.S. 319 (1976).

22.     Defendants' actions to sell TSU property without due process of proper legal authority subsequent to Court Order or Agreement violate the procedural and substantive due process rights guaranteed to the Plaintiff as a Tennessee resident under the Fifth and Fourteenth Amendment.

    a.  The acknowledged sale (or otherwise repurpose) of the Charlotte Avenue parcels(s) and the recommended sale of other campus properties are within the State's authority but should be compelled to adhere to proper procedural process for eminent domain to participate in the Nashville Next Plan of 2012.

    b.  Where the acknowledged sale (or otherwise repurpose) of the Charlotte Avenue parcels(s) and the recommended sale (or otherwise repurpose) of other campus physical and/or intellectual properties is subject to the conspiratorial and tortious interference of the key individuals – including the individuals as referenced in preceding paragraphs, efforts to sell said properties must be aborted – even abolished.

    c.  Whereas, Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983, Plaintiff alleges that her rights and protections under Brown v Board, 347 U.S. 483 (1954) are in jeopardy.

## COUNT V: VIOLATION OF THE MORRILL ACT

23.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

24.     Defendants' actions contravene the Morrill Act's requirement that funds and property designated for land-grant universities be used exclusively for their intended educational purposes. This includes all acquisition of plant facilities by purchase, court order, lease contract or other means.

25.     Similar principles were upheld in Missouri ex rel. Gaines v. Canada, 305 U.S. 337 (1938), which emphasized equitable access to public educational resources.

## COUNT VI: VIOLATION OF THE GEIER LAWSUIT AND CONSENT DECREE (2001)

26.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

27.     Defendants' actions contravene the Geier Consent Decree (2001) whose  blueprint and five-year requirement for funds and property designated for land-grant universities be used exclusively for their intended educational purposes.

    a)  The Governor's 2024 appointment of a race-specific complement of individuals to serve as the TSU Board of Trustees until General Assembly confirmation in 2025 further solidifies the overall perspective, treatment, and acceptance of TSU as a Black school – contrary to federal law, as well as, the Geier Lawsuit and Consent Decree (2001).

28.     Similar principles were upheld in Missouri ex rel. Gaines v. Canada, 305 U.S. 337 (1938), which emphasized equitable access to public educational resources.

## COUNT VII: VIOLATION OF STATE AND FEDERAL TRUST OBLIGATIONS

29.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

30.     Defendants will be in breach of their fiduciary and trust obligations to TSU by attempting to divest the state-sponsored school of property critical to its educational mission and

later of privatizing the educational delivery and ownership – either in part or in whole–specifically without public scrutiny or due process.

      a.  Defendants have relied significantly on the intentional tortious interference of multiple individuals and malicious, premeditated practices – including the subjects and fiduciary conspiratorial actions as named in preceding paragraphs.

31.    TSU's mission to educate underserved communities aligns with the public interest in promoting diversity, equity, and economic mobility through access to higher education.

32.    The rush sale, transfer, rental, or otherwise repurpose of TSU physical or intellectual property would irreparably harm the public interest by:

      a.  Drastically reducing TSU's capacity to serve its students and community;

      b. Undermining public confidence in the state's commitment to its public institutions; and

      c. Widening the existing educational and economic disparities of Tennesseans.

33.    US Courts have consistently recognized the importance of protecting public institutions that serve marginalized communities as with Mississippi University for Women v. Hogan, 458 U.S. 718 (1982) which is one of many hard-fought efforts to give serious reference to the importance of equitable access to educational resources.

## REQUESTED FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

1. Consider the merits of the Pauper's Oath filed contemporaneously which would otherwise allow for an irreparable miscarriage of justice against the Plaintiff's rights and interest.

2. Grant a Temporary Restraining Order (as filed contemporaneously) against all Defendants to prevent any further processes of a sale, transfer, or (to take possession of said properties) of any TSU property pending the resolution of this litigation where the list of parties addressed by the Order would include

  (A) the named parties;

  (B) the parties' officers, agents, servants, employees, and attorneys; and

  (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

3. Issue an Injunction against all Defendants to prevent any further processes of a sale, transfer, or (to take possession of said properties) of any TSU property pending the resolution of this litigation where the list to which the Order includes

  (A) the named parties –including the TSU Board of Trustees upon receipt of Confirmation by the Tennessee Legislature;

  (B) the parties' officers, agents, servants, employees, and attorneys; and

  (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

4. Forego an Injunction Bond as Plaintiff seeks Relief *in forma pauperis* pursuant to *Rule 65.05 - Injunction Bond*, Tenn. R. Civ. P. 65.05 ("Tenn. R. Civ. P. 65.05"). Further,

Schedule a hearing for a Preliminary Injunction at the earliest possible date so as to avert any unnecessary delay;

5.     Declare that Defendants' conduct violates Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment as described in *Fordice*.

6.     Preliminarily and permanently enjoin Defendants, their agents, representatives, and officers, from continuing the abuses described above, including acting in a manner inconsistent with the U.S. Constitution, the state's equal education opportunity obligations under State and federal law, including Title VI and *Fordice*.

7.     Preliminarily and permanently enjoin Defendants, their agents, representatives, and officers, from continuing the abuses described above, including duplicating academic programs of HBCU/MSI at proximately-located TWIs, including establishing and reestablishing collaborative enrollment and delivery work models in high demand areas of social work; teacher and other educational professional training; and law certificates and degrees.

8.     Preliminarily and permanently enjoin Defendants, their agents, representatives, and officers, from continuing the abuses described above, including delaying campus and facility improvement projects,

9.     Preliminarily and permanently enjoin Defendants, their agents, representatives, and officers, from continuing the abuses described above, including maintaining funding levels that do not ensure parity where as an initial effort of good faith would be to move the four-year and graduate activities of the TBR eCampus fully under Tennessee State University instead of as duplicative and/or competitive programs of study,

10.    Preliminarily and permanently enjoin Defendants, their agents, representatives, and officers, from continuing the abuses described above, including attempts to privatize the educational components of Tennessee State University – either in part or in whole,

11.     Order Defendants to dismantle and eliminate references to race in advertisement, admissions and matriculation in academic programming at state-supported Universities in Tennessee.   At TSU, this would be the TSU Undergraduate Program Dr. Levi Watkins Jr. Institute/TSU/Meharry Accelerated Pathway Program; and the Graduate Program of TSU Doctor of Physical Therapy Program.

12.     Order Defendants to transfer the remainder of $250 million determined by the Tennessee General Assembly to be due and owing to Tennessee State University (as Appropriated in the 2022 Legislative Budget) for use in any recovery phases currently under way for the 2024-2025 and 2025-2026 academic school year.  Further, Order the Appropriation of the remaining portions of the $544 million that the Tennessee General Assembly determined to be due and owing to Tennessee State University.

13.     Order Defendants to provide TSU with all the necessary resources and support to insure that it returns to its comparable and competitive status with Tennessee's TWI in all facets of operations and programs as prior to the FOCUS Act (2016), to ensure that the campus environments at TSU is comparable to TWIs with respect to physical characteristics of landscape, ambiance, student  life, appearance, availability, quality and adequacy of facilities necessary to support the missions and programs of the State University institutions.

14.     Order Defendants to immediately revise the State funding guidelines so as to create funding unique to the state-supported MSIs and focus on enhancing its MSI/HBCU university so that it reaches and maintains parity with Tennessee TWIs in all respects, as intended in the Geier Consent Decree.  Further, Order Defendant THEC to establish the 2024-2025 Tuition and Fees assessment model for TSU in the exact amounts at all universities so that no one school assesses students more or less that the rates currently at TSU.

15.     Order Defendants to immediately cease and desist from efforts of an internal

"TBR Financial Exigency" as efforts in any retrenchment strategies.

16.    Declare Tennessee State University as an eligible Unit [given the independent attributes of the University as defined in the FOCUS Act (2016)] for reorganization protections under United States Bankruptcy Code Chapter 9 in addressing imminent financial restructuring to allow for a fair and publicly transparent process of the public resources.

17.    Award Plaintiffs the cost associated with this action together with any future attorneys' fees and costs, and

18.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

*Harriet Callier*    02·03·2025

**Harriet C. Callier, Pro Se Plaintiff**
**W21691: E30376**

740 Revels Drive

Nashville, Tennessee 37207

Email: ncbam.mn@gmail.com

Phone: 989-767-7000

Messages: 205-205-1105

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that as directed by the Court (in absence of approval of in forma pauperis application), a true and correct copy of the foregoing action and any accompanying exhibits will be served upon each of the following parties.

_Callier_ 02.03.2025

**Harriet C. Callier, Pro Se Plaintiff**
**W21691: E30376**

740 Revels Drive, Nashville, Tennessee 37207

Email: ncbam.mn@gmail.com

Phone: 989-767-7000

Messages: 205-205-1105

**Office of the Attorney General & Reporter**

Attention: Office of General Counsel for

Jonathan Skrmetti

PO Box 20207

Nashville, TN    37202-0207

**Tennessee State University**

Attention: Office of General Counsel

3500 John A. Merritt Blvd., Nashville, TN  37209

**TSU Board of Trustees**

Attention: Office of General Counsel

3500 John A. Merritt Blvd., Nashville, TN  37209

**Tennessee Board of Regents**

Atten: General Counsel or Brian Lapps

1 Bridgestone Park, Third Floor

Nashville, TN   37214

**Tennessee Higher Education Commission**

Attention: Office of General Counsel

404 James Robertson Parkway

Parkway Towers, Suite 1900

Nashville, TN  37243